APPEARANCES
Plaintiff: Poisson, Poisson Bower, PLLC, Attorneys, Wadesboro, North Carolina; Fred D. Poisson, Jr., Counsel of Record.
Defendant: Young Moore Henderson, P.A., Attorneys, Raleigh, North Carolina; Jeffrey T. Linder, Counsel of Record.
 ***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Glenn and the briefs and oral argument before the Full Commission. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, and having reviewed the competent evidence of record, the Full Commission affirms the Opinion and Award of Deputy Commissioner Glenn with minor modifications.
 ***********
The Full Commission finds as fact and concludes as matter of law the following, which were entered into by the parties as:
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission and the Industrial Commission has jurisdiction of the parties and of the subject matter of this case. All parties are bound by and subject to the North Carolina Workers' Compensation Act. All parties have been *Page 2 
correctly designated and there is no question as to the misjoinder or nonjoinder of any party.
2. That plaintiff sustained a compensable injury by accident while in the course and scope of her employment with defendant-employer on August 20, 2001 when she lifted a roll of padding material up onto a set of bars and felt pain in her back.
3. That defendant-employer was insured by Key Risk Management Services, Inc. for workers' compensation purposes at all times relevant herein.
4. Plaintiff filed a Form 33 Request for Hearing on March 3, 2003 citing that defendants desired to submit plaintiff to a pain management program that was not indicated, that was well outside her geographic range and which was contrary to her psychiatric well being at that time.
5. Defendants filed a Form 61 Denial of the Claim on March 26, 2003 citing that there was no causal relationship between depression and injury by accident.
6. Defendants filed a Form 33R on April 7, 2003 citing that defendants were providing appropriate medical treatment as recommended by plaintiff's treating physicians.
7. Defendants filed a Form 24 Application on or about June 9, 2003 seeking to compel medical treatment in the form of compelling plaintiff to attend the pain management program at The Rehab Center.
8. A mediation was held on July 3, 2003 at which time the parties agreed to the following pursuant to the mediation agreement dated July 3, 2003 and the report of mediator dated July 22, 2003: procedure on treatment decisions, payment on past medications, plaintiff to pursue *Page 3 
GED, and plaintiff to withdraw Form 33 and defendants to withdraw Form 24.
9. An Order was entered by Special Deputy Commissioner Chrystina F. Kesler on July 10, 2003 indicating that defendants' application to terminate compensation be removed and treated as though it was withdrawn.
10. Plaintiff filed a Form 33 Request for Hearing with attachment on August 10, 2004 citing that defendants had failed to declare plaintiff totally and permanently disabled and to dispense with vocational rehabilitation.
11. Defendants filed a Form 33R on September 27, 2004 citing that plaintiff was no longer totally disabled within the meaning of the Workers' Compensation Act and that plaintiff's benefits should be suspended for failure to comply with an order of the Commission.
12. Defendants filed a Form 24 Application on December 7, 2004 and an amended Form 24 Application on December 13, 2004 citing plaintiff had been ordered to comply with vocational rehabilitation and continued to refuse to comply with vocational rehabilitation by not following up on job leads as directed by rehabilitation professionals — plaintiff filed her response to defendants' Form 24 on December 30, 2004.
13. An Order was entered by Special Deputy Commissioner Emily M. Baucom on February 23, 2005 disapproving defendants' Form 24 Application.
14. A second mediation was held on February 4, 2005 and resulted in an impasse pursuant to the February 18, 2005 report of mediator.
15. Defendants filed an amended 33R on March 9, 2005 to include a notice of appeal from the administrative Order of Special Deputy Commissioner Baucom entered on February 23, 2005; and
16. The parties, having conferred, do hereby agree and stipulate that pursuant to the *Page 4 
recently filed Form 60 Admission of Liability that at the time of her injury by accident, plaintiff had an average weekly wage of $270.53, which yields a compensation rate of $180.36. The parties also agree and stipulate that plaintiff was paid temporary total disability benefits from August 20, 2001 until September 29, 2003 at the rate of $200.01 per week and $180.36 since September 29, 2003 and continuing. Defendants contend that they are entitled to reimbursement for the overpayment of $2,394.36, and plaintiff denies the same. Both parties agree that the undersigned will determine the issue of whether repayment should be ordered.
17. The following is a list of the stipulated exhibits:
 a. All NCIC Forms from the August 20, 2001 injury including the following:
 i. Form 18 dated December 12, 2001
 ii. Form 19 dated August 22, 2001
 iii. Form 22
 iv. Form 33 dated March 3, 2003
 v. Form 33 dated August 10, 2004
 vi. Form 33R dated April 7, 2003
 vii. Form 33R dated September 27, 2004
 viii. Form 33R [amended] dated March 9, 2005
 ix. Form 61 dated March 26, 2003
 x. Form 63 dated April 7, 2003
 xi. Mediation Agreement dated July 3, 2003
 xii. Report of Mediator dated July 22, 2003
 xiii. Order by Special Deputy Commissioner Chrystina F. Kesler dated July 10, 2003 *Page 5 
 xiv. Order by Executive Secretary Tracey H. Weaver dated March 25, 2004
 xv. Report of Mediator dated February 18, 2005
 xvi. Order by Special Deputy Commissioner Emily M. Baucom dated February 23, 2005
 b. Index/Summary of medical records and the medical records included herein pertaining to the August 20, 2001 injury
 c. Plaintiff's responses to defendants' discovery
 d. Defendants' responses to plaintiff's discovery
 e. Defendants' supplemental responses to plaintiff's discovery
 f. Plaintiff's December 30, 2004 Form 24 response, including the following exhibits:
 i. Defendants' Form 24 attachments
 ii. Defendants' November 1, 2004 correspondence threatening to file a Form 24 application
 iii. Work restrictions from Dr. Laxer
 iv. Work restrictions from Dr. Hoover
 v. Job search documentation at CVS pharmacy
 vi. Job search documentation at Sears on December 29, 2003
 vii. Job search documentation at Sears on June 23, 2004
 viii. Job search documentation at Monroe Aquatics Fitness Center
 ix. Plaintiff's Request for Production of Documents
 x. Plaintiff's December 22, 2004 affidavit regarding job searching, *Page 6 
communication with Dr. Laxer and prescriptions
 xi. Dr. Laxer's September 14, 2004 note deferring issues regarding pain management and pain limitations to Dr. Hoover
 xii. Job descriptions submitted to Dr. Laxer for make work jobs at Nevins, Inc.
 xiii. Dr. Hoover's December 27, 2004 correspondence indicating jobs that plaintiff is able and is unable to perform
 xiv. Plaintiff's job search documentation, including executed verifications by companies that applications were submitted
 xv. January 24, 2005 verification by Amy Paschal, GED instructor, indicating that plaintiff is unable to stay for entire allotted class time due to back pain
 g. Home Instead Senior Care employment application and job description
 h. Job description and records from Nevins, Inc.
 i. Defendants' Responses to plaintiff's December 16, 2004 Request for Production of Documents [without attachments]
 j. Notice of Withdrawal of Form 24 dated August 23, 2006
 k. Video surveillance from June 2005;
 l. Video surveillance from July 2005;
 m. Vocational rehabilitation reports
18. The issues to be determined from the hearing were as follows:
 a. Whether plaintiff is totally and permanently disabled as a result of her injury by accident? *Page 7 
 b. Whether vocation rehabilitation should be stopped?
 c. Whether defendants should be directed to pay plaintiff's attorney's fees?
 d. Whether defendants have made any overpayment of benefits, and if so, whether they are entitled to an off set?
 e. Whether plaintiff's compensatory benefits should be terminated for plaintiff's refusal of suitable employment?
 f. Which doctor should continue to direct plaintiff's care?
 ***********
Based upon all of the competent evidence of record and the reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was fifty-three years old, with her date of birth being January 9, 1954. Plaintiff attended school up to the end of her eighth grade year.
2. Plaintiff worked as a dye-cutter for defendant-employer. On August 20, 2001 while lifting a large roll of laminate padding, plaintiff felt an immediate onset of severe pain in her low back and into her right leg.
3. Defendants accepted plaintiff's claim and paid for her medical treatment, however, defendants did not file a Form 60 with the Industrial Commission until March 21, 2007.
4. On the date of the accident, plaintiff treated with a local physician at the Anson County Hospital. He referred plaintiff to Dr. Chason Hayes of Carolina Bone Joint. Dr. Hayes prescribed physical therapy and some medication. He also put plaintiff on light duty work with a twenty pound lifting restriction. *Page 8 
5. After failing to respond to the treatment provided by Dr. Hayes, plaintiff sought treatment with Dr. Eric Laxer of Charlotte Orthopedic Specialists. Plaintiff presented to Dr. Laxer on September 6, 2001. Dr. Laxer diagnosed plaintiff's condition as right S-1 or L-5 radiculopathy. He wrote plaintiff out of work completely and prescribed Vicodin for her and scheduled a lumbar MRI. The MRI revealed a minimal disc bulge at L3-L4, a far lateral disc bulge at L4-L5 and a shallow protrusion on the right affecting the L-4 nerve root and a left paracentral foraminal disc bulge at L5-S1 affecting the left S1 nerve root. Dr. Laxer diagnosed a right L4-L5 foraminal disc rupture that he believed correlated with her symptoms of right L4 radiculopathy.
6. Dr. Laxer recommended that plaintiff return to physical therapy. Plaintiff returned to physical therapy, however, her condition did not improve much. Consequently, plaintiff returned to Dr. Laxer on October 18, 2001 and a decision to proceed with surgery was made.
7. On November 21, 2001, Dr. Laxer performed a right L4-L5 microdiscectomy because of the pain down plaintiff's right leg with numbness and weakness. Plaintiff recovered well from the surgery but she retained pain in her low back and into her right leg.
8. Plaintiff continued to have a lot of pain in her back, right thigh and lower leg. She felt that she had not experienced any relief from her surgery. Her complaints after the surgery were pain-related, whereas her complaints prior to surgery were numbness. Dr. Laxer noted plaintiff was in obvious discomfort and gave her a lumbar corset and changed her medications.
9. Dr. Laxer ordered a follow-up MRI to see if plaintiff had any residual L4 nerve root compression and ordered plaintiff to stay out of work and refrain from driving. Dr. Laxer opined that plaintiff was quite depressed and frustrated over her situation of continued pain and being out of work. Therefore, he ordered that plaintiff begin taking Wellbutrin.
10. The second MRI revealed post-operative changes at L4-L5 and an abundant *Page 9 
enhancement and epidural fibrosis surrounding the right L4 nerve root ganglion. There was a one centimeter diameter fluid collection lateral and posterior to the ganglion most consistent with seroma or hematoma. Dr. Laxer determined that there was no residual nerve root impingement, but based on the findings, he decided to refer plaintiff to Dr. Joshua Seth Miller at Southeast Pain Care for a pain management assessment.
11. Dr. Miller examined plaintiff on March 5, 2002. At this examination, plaintiff rated her pain as a six out of ten and described it as an aching, shooting pain with numbness that was constant. Plaintiff reported that she needed help with daily activities on an occasional to frequent basis and that her quality of life was extremely poor secondary to her pain. Plaintiff also stated that her pain frequently disrupted her sleep. Based on this examination, Dr. Miller recommended that plaintiff continue with OxyContin and OxyIR and consider a trial lumbar epidural steroid nerve block or a spinal cord stimulator.
12. Defendants refused to authorize the spinal cord stimulator and shortly thereafter changed plaintiff's treating physician.
13. Plaintiff continued to have pain while using a TENS unit and taking Oxycontin (20mg/day), Oxycodone (10mg/day), Wellbutrin and Naprosyn. Dr. Laxer recommended that plaintiff go back to Southeast Pain Clinic for continued pain management. He also felt that it may be appropriate for plaintiff to attempt to work four hours a day, five days a week with restrictions of no lifting more than two pounds and allowing her to sit and stand at will.
14. On September 26, 2002, plaintiff's file was referred to VocMed, Inc. for vocational case management by defendants. From September 26, 2002, to August 31, 2005, the VocMed, Inc. records indicate that plaintiff's academic progress and attendance were monitored in her GED courses, her search for prospective employment and her ability to return to a *Page 10 
productive lifestyle.
15. Over the course of three years, plaintiff met regularly with numerous VocMed representatives. The purpose of these meetings was to find prospective employment for plaintiff and to this end, numerous job searches were conducted, leads were provided by her case managers and plaintiff was monitored for compliance in following up on the provided job leads. However, they did not find any jobs that plaintiff was able to perform.
16. Dr. Laxer referred plaintiff to Dr. Gerald Aranoff at Southeast Pain Clinic. Dr. Aranoff diagnosed plaintiff with failed back surgery syndrome, depression related to failed back surgery syndrome and chronic pain syndrome. He also recommended that plaintiff participate in a pain rehabilitation program at the Rehab Center that was geared toward functional restoration so that she could better manage her persistent pain and increase her daily life activities. Plaintiff discussed this recommendation with Dr. Laxer and he noted that the main problem with this recommendation was that participation in such a program at the Rehab Center in Charlotte would require her to drive one and a half hours per day each way.
17. At that point, given all of this information, Dr. Laxer felt that plaintiff had reached maximum medical improvement. He recommended that she consider total disability for her back and gave her a fifteen percent (15%) permanent partial disability rating. Dr. Laxer indicated that he had referred plaintiff to pain management and that he did not recommend any further active care. He also indicated that it would be appropriate for plaintiff to participate in vocational rehabilitation.
18. Plaintiff was still meeting with the VocMed representatives, and in a May 22, 2003 memorandum, Mr. Henderson indicated that he believed that plaintiff could return to work as a Personal or Home Care Aide. Mr. Henderson based this opinion on various job descriptions that he felt plaintiff's restrictions would tolerate and plaintiff's previous experience as a care worker. *Page 11 
19. Sometime between February 12, 2003 and July 7, 2003, plaintiff's VocMed file was closed by defendants. Subsequently, her file was reopened and on July 7, 2003, Brian Bernas took over for Ms. Maynard. Mr. Bernas continued monitoring plaintiff's progress in her GED courses and conducted joint job searches with plaintiff.
20. Plaintiff returned to Dr. Laxer on September 12, 2003 with complaints of continuing pain. She told him that she could only tolerate one hour of vocational rehabilitation per day and that she was currently required to attend vocational rehabilitation four hours per day. Dr. Laxer agreed that it would be appropriate for plaintiff to continue her attempts to obtain her GED, but he reiterated that he felt that plaintiff should be considered for total disability related to her back and that her restrictions remained as previously enumerated.
21. Dr. Laxer also recommended continued use of pain medication to control plaintiff's pain, but he felt that this could be administered through Dr. Hoover's office. Dr. Hoover was plaintiff's primary care physician, and he had taken over plaintiff's care after Dr. Ganzon left his practice in 2003. Plaintiff continued treating with Dr. Hoover for pain medication management. She also continued with vocational rehabilitation.
22. On November 12, 2003, plaintiff reported to Dr. Hoover that her pain was increasing and worse at night. She also indicated that she wanted to pursue other options for pain management, but no other options were offered.
23. In January of 2004, plaintiff passed the first section of the GED test, despite her pain and restrictions. She also continued to participate in job searches under Mr. Cox's supervision. It should be noted that Dr. Laxer continued to indicate to defendants that plaintiff was totally disabled.
24. Plaintiff returned to Dr. Hoover on March 10, 2004 with complaints of worsening *Page 12 
back pain and worsening right leg pain. And on July 21, 2004, plaintiff informed Dr. Hoover that she had worsening of her leg pain, weakness, dizziness and loss of balance. At that point, Dr. Hoover was of the opinion that plaintiff was unable to drive more than twenty miles in one direction due to her chronic pain and weakness; and that she was unable to sit or stand for more than fifteen minutes at a time.
25. On or about November 1, 2004, defendants indicated that they believed that plaintiff was not complying with vocational rehabilitation and that they would file a Form 24 if she did not settle her case. Plaintiff refused to settle her case and returned to Dr. Laxer on November 8, 2004 with Mr. Bernas.
26. Dr. Laxer reported that it seemed to him that vocational rehabilitation had been trying really hard to find work for plaintiff and that plaintiff had made extensive attempts to find work by her working with six different vocational professionals.
27. Mr. Bernas made note of this visit to Dr. Laxer, and in his notes, he indicated that after Dr. Laxer had told him that plaintiff was totally disabled, he had spoken privately with Dr. Laxer, without plaintiff's presence or consent. This conversation concerned plaintiff's prospective for employment in light of her physical restrictions and chronic pain. Mr. Bernas urged Dr. Laxer to give him the opportunity to find plaintiff work, even though she had already been through six other rehabilitation professionals without success.
28. To determine whether further vocational rehabilitation was advisable at this time, Dr. Laxer asked Mr. Bernas to go through plaintiff's records and summarize what jobs she had filled out applications for, what jobs she had been on interviews for and what jobs had rejected her because of her limitations so that Dr. Laxer could determine whether to recommend further vocational rehabilitation or not. *Page 13 
29. Mr. Bernas wanted plaintiff to go to a program at Nevins, Inc. in Monroe, North Carolina, which she did on November 16, 2004. Ms. Peterson had originally submitted the description of Nivens back in July or August 2004, and Mr. Bernas resubmitted it around this time, but did not copy the counsel for plaintiff on this re-submission.
30. On November 17, 2004, plaintiff returned to Dr. Hoover with continuing complaints of chronic low back pain and sciatic pain, but on November 23, 2004, she was accepted into the Nevins program. Plaintiff also reported her increased pain to Mr. Bernas during this time and told him that her chronic pain was making it difficult for her to complete her GED classes and her vocational evaluation sessions at Nevins.
31. Nevins's director, Danny Sapp, testified that when plaintiff presented to him, she tried to do work but was in a lot of pain and could not stay more than one hour at a time. He also testified that the evaluation process was to determine plaintiff's general skill levels.
32. Despite plaintiff's pain and difficulty in the Nivens evaluation, on December 2, 2004, Mr. Bernas wrote to Dr. Laxer requesting approval for her to participate in the program at Nevins. Dr. Laxer deferred to Dr. Hoover on this issue, and on December 17, 2004, Dr. Hoover indicated that plaintiff should continue to refrain from driving given her continued pain and increase in pain medications.
33. Dr. Hoover later wrote to Mr. Bernas and indicated that plaintiff could attempt to perform money handling duties, clerical duties and attend GED classes, but he also stated that it was important that she be able to take her pain medication and that it may interfere with her cognitive abilities. Neither Dr. Laxer nor Dr. Hoover was informed that Nivens was a program for the developmentally disabled.
34. On December 30, 2004, defendants filed a Form 24 Application to Terminate *Page 14 
Plaintiff's Compensation, on the grounds that plaintiff had been ordered to comply with vocational rehabilitation but that she had not complied because she had not followed up on job leads as directed by her rehabilitation professionals. In support of their application, defendants attached several letters from potential employers alleging that plaintiff had not submitted applications for employment when she had indicated that she had. Defendants had provided letters from CVS, Sears, Monroe Aquatics and Fitness Center, Bath Body Works, Mayflower Seafood and Fashion Bug indicating that plaintiff had not filed applications.
35. Plaintiff submitted a response to defendants' Form 24 with extensive documentation refuting the letters that defendants had provided in support of their Form 24. Plaintiff's response sets forth in detail plaintiff's restrictions and medications, details regarding prohibited exparte communications between Mr. Bernas and Dr. Laxer, Dr. Hoover's opinion that submitted job descriptions were inappropriate for plaintiff and information regarding the nature of these job descriptions, namely that they were descriptions of make-work jobs in a simulated environment as opposed to actual jobs available in the job market.
36. Additionally, plaintiff provided with her response, an affidavit and notes from her job search indicating that she had submitted an application in person to Dave at CVS; she had submitted an application on computer to Sears, but that she was informed that they require a high school diploma, which she does not have; she submitted notes indicating that Monroe Aquatic and Fitness Center would not allow her to submit an application because she did not meet their requirements, i.e. not knowing CPR and having restrictions of sitting and standing; she had submitted an application in person to Bath Body Works to Sharon McCollum, which was later found under the name of Katherine Martin, and Ms. McCollum signed a statement indicating that she had received this application; she submitted notes and a signed statement from the manager, *Page 15 
Angelo, showing that she had submitted an application in person to him for Mayflower Seafood; and she had submitted an application to the manager of Fashion Bug, Karen Huntley, who confirmed this in writing and which Brian Bernas later found under the name of Katherine Martin. In addition, H. M. Patel, the manager for Econolodge, wrote a note indicating that he had received an application from plaintiff under the name Katherine Martin. Plaintiff also submitted numerous other job search forms and information regarding other job leads.
37. Defendants' Form 24 was denied with a finding that plaintiff was compliant with job search and her GED classes. Defendants appealed this decision; however, the appeal was later withdrawn. Mr. Bernas stated that the appeal was withdrawn because the facts established that plaintiff had complied with vocational rehabilitation.
38. On January 6, 2005, Dr. Hoover restricted plaintiff from any driving.
39. Plaintiff was officially terminated from Nevins on March 3, 2005, effective March 5, 2005. On March 16, 2005, Mr. Bernas noted that he had been instructed to close plaintiff's file.
40. In a letter to the carrier, dated April 12, 2005 and without having met with plaintiff, Mr. Henderson maintained that, in his professional opinion, "plaintiff continues to remain employable in a position within her physical issued restrictions at a wage equal to or with the expectation of returning to her pre-injury compensation." Mr. Henderson remarked that furthering her education was a realistic goal, especially considering that plaintiff had been terminated from Nevins. Mr. Henderson included in his report a listing of job opportunities that he stated were within plaintiff's restrictions. The employment opportunities listed were as follows: night security guard, camp store manager, container site attendant and child nutrition assistant. The Enquirer Journal newspaper listed these available opportunities: nail technician, *Page 16 
cashier and sewing machine operator. Mr. Henderson listed these leads from the North Carolina Employment Security Commission: fast food worker, wait staff, crew leader for fast food restaurant, colorist and biscuit maker. Mr. Henderson never did an investigation of any of these jobs to determine whether any of them were in fact within the restrictions that plaintiff had been given by her treating physicians.
41. On June 3, 2005, plaintiff was notified by Mr. Bernas that defendants had decided to reopen her file for vocational rehabilitation.
42. Defendants also hired an investigator to watch plaintiff from June 11, 2005 through July 12, 2005. The Full Commission finds that the reports of the investigators unpersuasive as they do not offer any indication of plaintiff's abilities.
43. As part of her vocational rehabilitation, Mr. Bernas had instructed plaintiff to attend a job interview at Home Instead Senior Care on July 11, 2005. The investigator actually observed them go to Home Instead Senior Care for the interview. The owner of Home Instead Senior Care, Chris Lonon, indicated that the interview went well, but that he was concerned about plaintiff's being unable to drive. Mr. Lonon noted that driving was a necessary condition for employment, so he did not offer plaintiff a job.
44. The Full Commission finds that the Home Instead job and the Nevins program were not suitable for plaintiff and were not designed to get plaintiff into suitable work.
45. At the hearing of this matter before Deputy Commissioner Glenn, he directed the parties to obtain an FCE. Dr. Welshofer performed his IME and arranged an FCE to be done for plaintiff. Dr. Welshofer met with plaintiff on September 25, 2006. He found that plaintiff's complaints and history on presentation were consistent with his physical findings on examination. He also believed that plaintiff had sciatica and discogenic back pain, specifically that she had *Page 17 
symptoms consistent with a lumbar nerve root being irritated.
46. Dr. Welshofer felt that further testing would be necessary to determine the best pain management options for plaintiff. He recommended that an MRI with gadolinium contrast be performed to see the nature and extent of scarring before making any further decisions on plaintiff's treatment. Dr. Laxer agreed with this recommendation. Dr. Welshofer felt that a spinal cord stimulator, as suggested by Dr. Miller, may have been a good option in 2002; however, a new nerve test would be necessary to determine if there was chronic nerve damage to warrant such treatment. The spinal cord stimulator was really the only thing that Dr. Welshofer could think of that might benefit plaintiff, but given the time period that plaintiff has had these symptoms, it may be too late for the treatment to really work.
47. At the FCE, plaintiff could only tolerate one circuit of the FCE before she had to stop because of pain. Dr. Welshofer testified that he did not think that the multi-disciplinary program at the Rehab Center in Charlotte would be reasonable for plaintiff at this point because of the way that she responded to the FCE. He also believed that simply putting plaintiff in the work conditioning program, without the stimulator or other help to control her pain, would more likely than not make her pain worse. Dr. Welshofer opined that pain could limit and was a limit to plaintiff's work abilities.
48. Dr. Welshofer classified plaintiff as sedentary. However, he concluded that right now, plaintiff was at a very low level and that it would be hard to find her a job without controlling her pain first. While agreeing that plaintiff was credible, Dr. Welshofer deferred to Dr. Laxer and Dr. Hoover, the treating physicians, regarding opinions of plaintiff's pain.
49. Dr. Hoover found plaintiff to be credible. He felt that her vocational status was sedentary at best. He believed that there were certain types of jobs that plaintiff could do, but that *Page 18 
the medications she was taking for her pain may impeded her cognitive abilities such that she could not perform sedentary labor. Dr. Hoover could not think of too many jobs that would fit within plaintiff's restrictions, and he did not have any other patients who were taking the same medications as plaintiff that were employed. Dr. Hoover concluded that he had offered plaintiff everything he had to offer and could only manage her pain with medication from this point forward.
50. Dr. Laxer testified that plaintiff had poor endurance secondary to pain. He had nothing further to offer her from a surgical standpoint. He agreed with Dr. Welshofer that additional pain management would be necessary prior to plaintiff's stamina improving, as her stamina would not improve until her pain improved. He opined that plaintiff does not have the ability to sustain sedentary activity in an occupational setting for over an hour and that vocational rehabilitation should be discontinued.
51. Based on the greater weight of the evidence, the Full Commission finds that plaintiff does not have the ability to sustain sedentary employment for more than one hour and is therefore unable to obtain or hold employment or continue in vocational rehabilitation.
52. When defendants started to make compensatory benefit payments, they had all of plaintiff's payment records as to what her wages were at and prior to her compensable injury by accident. Therefore, plaintiff's average weekly wages are the wages that the defendants began to pay when they admitted and accepted this claim and began to make compensatory benefits. That average weekly rate as determined by defendants was $270.53 per week which yields a compensation rate of $180.36 per week. Defendants paid plaintiff a compensation rate of $200.01 per week from August 20, 2001 through September 29, 2003, and they should continue to pay at the same rate.
53. Based on the greater weight of the evidence, the Full Commission finds that the *Page 19 
defendants unreasonably defended this claim. It is clear from a review of the medical records and the opinion of the treating physician that defendants interfered with plaintiff's medical treatment as prescribed by her treating physicians when they changed plaintiff's treating physician as opposed to providing timely medical treatment that was prescribed by her authorized doctors. Additionally, it is clear from the medical evidence that plaintiff was not able to work or participate in vocational rehabilitation.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained an admittedly compensable injury by accident arising out of and in the course and scope of her employment with defendant-employer on August 20, 2001. N.C. Gen. Stat. § 97-2(6).
2. When the primary injury is shown to have arisen out of and in the course of employment, every natural consequence that flows from the injury arises out of the employment, unless it is the result of an independent intervening cause attributable to claimant's own intentional conduct. Horne v. Universal Leaf Tobacco Processors, 119 N.C. App 682,459 S.E.2d 797 (1995). Thus, plaintiff's depression, for which she was receiving treatment, is compensable. N.C. Gen. Stat. § 97-25.
3. In a workers' compensation claim for permanent and total disability, plaintiff has the burden of proving the existence and extent of disability. Hunt v. North Carolina State University,159 N.C. App. 111, 582 S.E.2d 380 (2003), citing Saunders v. EdentonOb/Gyn Ctr., 352 N.C. 136, 530 S.E.2d 62 (2000); Russell v. Lowes ProductDistribution, 108 N.C. App. 762, 425 S.E.2d 454 *Page 20 
(1993). A plaintiff may meet the initial burden by producing one of the following: (1) medical evidence that he is physically or mentally, as a result of the work-related injury, incapable of work in any employment; (2) evidence that he is capable of some work, but that he has, after a reasonable effort, been unsuccessful in his efforts to obtain employment; (3) evidence that he is capable of some work, but that it would be futile because of pre-existing conditions, such as age, inexperience, or lack of education, to seek other employment; or (4) evidence that he has obtained other employment at wages less than his pre-injury wages. Demery v. Perdue Farms, 143 N.C. App. 259,535 S.E. 2d 485 (2001); Russell v. Lowes Product Distribution, supra.
When an employee meets his burden of showing disability, the burden shifts to defendants to produce evidence that suitable jobs are available for the employee and that the employee is capable of obtaining a suitable job, taking into account both physical and vocational limitations. Demeryv. Perdue Farms, Inc., supra.
4. In the present case, as a direct result of her injury by accident, plaintiff is disabled and continues to be disabled and unable to return to work with defendant-employer or any other employer due to her restrictions, work experience, and education. Defendants have provided insufficient evidence that suitable jobs are available to plaintiff and that plaintiff is capable of obtaining a suitable job, given her physical and vocational limitations. For these reasons, plaintiff is totally and permanently disabled. N.C. Gen. Stat. § 97-29.
5. Plaintiff's average weekly wage is $270.53, yielding a compensation rate of $180.36. N.C. Gen. Stat. § 97-2(5).
6. Defendants are obligated to provide to plaintiff such medical treatment as is reasonably required as a result of her injury by accident to effect a cure, give relief, or lessen her disability. N.C. Gen. Stat. § 97-25; Little v. Penn Ventilator Co., 317 N.C. 206,345 S.E.2d 204 (1986). *Page 21 
7. Defendants are not entitled to any credit as there has been no overpayment of benefits. N.C. Gen. Stat. § 97-42.
8. Plaintiff should recover attorney's fees in this matter, as defendants have defended this claim without reasonable grounds. This conduct amounts to stubborn, unfounded litigiousness. Troutman v. White Simpson Inc., 121 N.C. App. 48, 464 S.E.2d 481 (1995), disc. reviewdenied, 343 N.C. 516, 472 S.E.2d 26; N.C. Gen. Stat. § 97-88.1.
9. Defendants, having appealed this matter to the Full Commission, should be taxed the costs of this hearing including attorney fees. N.C. Gen. Stat. § 97-88.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff is entitled to receive, and defendants shall pay, total disability benefits in the amount of $180.36 per week, continuing until further order of the Commission.
2. Defendant shall pay for all medical expenses incurred or to be incurred by plaintiff as a result of her compensable injury, including plaintiff's psychological condition, when bills for the same have been submitted according to established Industrial Commission procedures, for so long as such evaluations, treatments and examinations may reasonably be required to effect a cure, give relief and/or lessen plaintiff's period of disability.
3. Dr. Hoover shall remain as plaintiff's authorized treating physician, and Dr. Welshofer shall assist him in ordering and administering testing to further explore pain management solutions for plaintiff. Defendants shall pay for this testing and any recommendations from Dr. Welshfoer, Dr. Hoover and any other physicians that they refer plaintiff to that will lessen her pain. *Page 22 
4. Defendants are not entitled to a credit in this matter.
5. Defendants shall cease vocational rehabilitation and shall not require plaintiff to submit to further vocational rehabilitation. VocMed and its employees are expressly removed from the case.
6. Plaintiff's counsel shall submit an affidavit setting out the time spent in this matter, including his normal hourly rate in order for the Full Commission to award an attorney fee under N.C. Gen. Stat. §§ 97-88.1
and 97-88.
7. Defendants shall pay the costs.
This the 4th day of June, 2008. S/___________________ DANNY LEE McDONALD COMMISSIONER
CONCURRING:
S/___________________ BERNADINE S. BALLANCE COMMISSIONER
S/_______________ CHRISTOPHER SCOTT COMMISSIONER *Page 1